# No. 25-11032

---

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

Athina Karahogitis,
*Plaintiff - Appellant*

v.

TPUSA, Inc., doing business as Teleperformance USA; Does 1-20,
*Defendants - Appellees*

---

Appeal from the United States District Court
for the Northern District of Texas
Case No. 4:24-CV-706
Hon. Mark T. Pittman

---

**BRIEF OF APPELLANT ATHINA KARAHOGITIS**

---

J. Brian Vanderwoude
DORSEY & WHITNEY LLP
200 Crescent Court, Suite 1600
Dallas, TX 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile
vanderwoude.brian@dorsey.com

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
| --- | --- |
| TPUSA, Incorporated | Eric Gordon<br>Akerman, L.L.P.<br>West Palm Beach, FL |
| TPUSA, Incorporated | Ryan Krone<br>Akerman, L.L.P.<br>Houston, TX |

| Appellant: | Counsel for Appellants: |
| --- | --- |
| Athina Karahogitis | Brian Vanderwoude<br>Dorsey & Whitney LLP<br>Dallas, TX |

*/s/ J. Brian Vanderwoude*
Attorney of record for Appellant

ii

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and Fifth Circuit Rule 28.2.3, Appellant, Athina Karahogitis, respectfully requests oral argument. This appeal involves the intersection of employment law and contract law, as well as a substantial summary-judgment record. Oral argument will meaningfully assist the Court's analysis of the merits of this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.............................................ii

STATEMENT REGARDING ORAL ARGUMENT................................ iii

TABLE OF CONTENTS ....................................................................iv

TABLE OF AUTHORITIES.................................................................vi

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES.............................................................1

STATEMENT OF THE CASE ...............................................................3

   A.    Karahogitis worked within the Teleperformance Group and agreed to receive commissions as part of her compensation. ...............3

   B.    The Teleperformance Group promoted Karahogitis twice in 2022, but then withheld her earned commissions, bonuses, and fees until she signed new employment agreements. ....................................5

   C.    Karahogitis' agreements with the Teleperformance Group.........8

   D.    Teleperformance then decided that Karahogitis should be an employee of TPUSA, not TGI. .............................................................10

   E.    In April 2023, Teleperformance reneged on its promise to pay Karahogitis her earned commissions, bonuses, and fees. ...................11

   F.   Karahogitis endured inappropriate comments and unfair treatment because of her sex, disability, and age................................14

   G.    TPUSA eliminated Karahogitis' global position as "redundant" in September 2023, and then terminated her from both her roles in November 2023, offering ever-changing explanations for the sudden termination and replacing her with a male. ........................................19

SUMMARY OF THE ARGUMENT .....................................................21

STANDARD OF REVIEW...................................................................22

ARGUMENT ......................................................................................23

   A.    Karahogitis' discrimination claims. ..........................................23

      i.   The "same actor" defense does not rule out Karahogitis' ability to prove her discrimination claims. ...................................................24

      ii.  Direct evidence supporting Karahogitis' discrimination claims. 26

      iii.   Circumstantial evidence also supports Karahogitis' discrimination claims. ...................................................................30

      iv.   TPUSA's articulated reason(s) for terminating Karahogitis are pretextual........................................................................................47

   B.    Karahogitis' breach of contract claim.......................................57

      i.   The First Amendment is unclear and ambiguous, thereby necessitating consideration of parol evidence. ..................................58

      ii.  Karahogitis performed under the agreements by timely submitting documentation substantiating her earned commissions, fees, and bonuses. ...............................................................................63

      iii.   TPUSA breached the contract by withholding Karahogitis' earned commissions, fees, and bonuses. ...........................................63

      iv.   Because of TPUSA's breach, Karahogitis has sustained damaged. ...........................................................................................64

   C.    Karahogitis' fraud claim. ...........................................................65

CONCLUSION .................................................................................67

CERTIFICATE OF SERVICE...............................................................69

CERTIFICATE OF COMPLIANCE .......................................................70

# TABLE OF AUTHORITIES

<u>CASES</u>

*Allen v. USPS*, 63 F.4th 292 (5th Cir. 2023) .............................................30

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................23

*Bautista v. Quest Diagnostics Clinical Labs., Inc.*, No. H-11-4162, 2013 U.S. Dist. LEXIS 124236 (S.D. Tex. Aug. 30, 2013) ...........................24

*Bragdon v. Abbott*, 524 U.S. 624, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998)................................................................................................37

*Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408 (5th Cir. 2007) ...........................................................................................53

*Caldwell v. KHOU-TV*, 850 F.3d 237 (5th Cir. 2017) ............................53

*Capio Funding, L.L.C. v. Rural/Metro Operating Co., L.L.C.*, 35 F.4th 353 (5th Cir. 2022)....................................................................................23

*Coker v. Coker*, 650 S.W.2d 391 (Tex. 1983)...........................................58

*Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587 (Tex. 1996) ........................................................................................58

*Cutrera v. Bd. of Supervisors of La. St. Univ.*, 429 F.3d 108 (5th Cir. 2005)..................................................................................................41

*Dabbasi v. Motiva Enters. LLC*, 107 F.4th 500 (5th Cir. 2024) ...............48

*Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476 (5th Cir. 2016) .......................................................................................................32

*E. Tex. Fire Ins. Co. v. Kempner*, 87 Tex. 229, 27 S.W. 122 (Tex. 1894) 58

*E.E.O.C. v. Tex. Instruments Inc.*, 100 F.3d 1173 (5th Cir. 1996)..........27

*EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606 (5th Cir. 2009) ..........................................................................................................38

*EEOC v. LHC Grp., Inc.*, 773 F.3d 688 (5th Cir. 2014) .........................37

*Eyob v. Mitsubishi Caterpillar Forklift Am., Inc.*, No. H-16-1688, 2017 U.S. Dist. LEXIS 118574 (S.D. Tex. 2017) ..........................................25

*First Bank v. Brumitt*, 519 S.W.3d 95 (Tex. 2017)..................................60

*Florer v. Elec. Data Sys. Corp.*, No. 3:03-cv-1175-H, 2004 U.S. Dist. LEXIS 16854 (N.D. Tex. Aug. 24, 2004)...............................................46

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41 (Tex. 1998)..................................................................65

*Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 423 (4th Cir. 2014) ..............35

*Galvan v. City of Bryan*, 367 F. Supp. 2d 1081 (S.D. Tex. 2004) ...........37

*Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 322 (5th Cir. 2019) .......................................................................................................35

*Gosby v. Apache Indus. Servs., Inc.*, 30 F.4th 523 (5th Cir. 2022) ..51, 52, 54

*Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470 (5th Cir. 2015)......31

*Haase v. Glazner*, 62 S.W.3d 795 (Tex. 2001).........................................66

*Harry v. Dallas Hous. Auth.*, 662 Fed. Appx. 263 (5th Cir. 2016) .........27

*J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223 (Tex. 2003) .................58

*Jones v. New Orleans Reg'l Physician Hosp. Org., Inc.*, 981 F.3d 428 (5th Cir. 2020).........................................................................................22

*Laxton v. Gap Inc.*, 333 F.3d 572 (5th Cir. 2003).............................49, 55

*Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253 (5th Cir. 2009) .......................32

*Massimo Motor Sports, LLC v. Shandong Odes Indus. Co.*, No. 3:21-cv-2180-X, 2024 U.S. Dist. LEXIS 20345 (N.D. Tex. Feb. 6, 2024)..........64

*McCoy v. City of Shreveport*, 492 F.3d 551 (5th Cir. 2007)....................23

*McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447 (5th Cir. 2019)..................................................................................31

*Nall v. BNSF Ry. Co.*, 917 F.3d 335 (5th Cir. 2019) ..............................23

*Neal v. Williamson Cty.*, No. 1:23-cv-759-RP, 2024 U.S. Dist. LEXIS 202224, at *11 (W.D. Tex. Nov. 6, 2024) ............................................35

*Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527 (5th Cir. 2015) ....................................................................................23

*Palasota v. Haggar Clothing Co.*, 342 F.3d 569 (5th Cir. 2003).............28

*Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004)..........31, 54

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ..........48

*Russell v. McKinney Hosp. Venture*, 235 F.3d 219 (5th Cir. 2000) ........24

*Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386 (5th Cir. 2020) .....23

*Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893 (5th Cir. 2002).........27

*See Moss v. BMC Software Inc.*, 610 F.3d 917 (5th Cir. 2010) ...............27

*Skipper v. Fedex*, No. 3:23-cv-212-E-BN, 2023 U.S. Dist. LEXIS 231696, at *21 (N.D. Tex. Dec. 8, 2023) .........................................................35

*Smith v. City of St. Martinville*, 575 Fed. Appx. 435 (5th Cir. 2014).....30

*Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432 (Tex. 1986)................65

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)................................................................................30

*Staten v. New Palace Casino, LLC*, 187 Fed. Appx. 350 (5th Cir. 2006)54

*Taylor v. Principal Fin. Group*, 93 F.3d 155 (5th Cir. 1997).................40

*Texas v. Am. Tobacco Co.*, 463 F.3d 399 (5th Cir. 2006)........................58

*Toyota Motor Manufacturing Kentucky Inc. v. Williams*, 534 US 184 (2002)................................................................................................38

*URI, Inc. v. Kleber Cty.*, 543 S.W.3d 755 (Tex. 2018) ............................58

*Wade v. Lyondell-Citgo Ref.*, 2005 U.S. Dist. LEXIS 55244, 2005 WL
     8168888 (S.D. Tex. Dec. 20, 2005) ........................................................51

*Waldrip v. Gen. Elec. Co.*, 325 F.3d 652 (5th Cir. 2003) ..........................37

*Windham v. Harris Cnty.*, 875 F.3d 229 (5th Cir. 2017) ........................40

## STATUTES

28 U.S.C. § 1291..............................................................................................1

28 U.S.C. § 1331..............................................................................................1

42 U.S.C. § 12102..........................................................................................37

42 U.S.C. § 200e-5 ...........................................................................................1

*E.E.O.C. v. Sara Lee Corp.,* 237 F.3d 349 (4th Cir. 2001) ......................38

## REGULATIONS

29 C.F.R. § 1630..............................................................................................37

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 200e-5(f)(3) because Karahogitis' claims invoked federal question jurisdiction. On August 7, 2025, the district court granted summary judgment in favor of Teleperformance and ruled that Karahogitis should take nothing by way of her claims. Karahogitis timely filed a Notice of Appeal on September 6, 2025. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Did the district court err in applying the same actor defense to give rise to an inference that discrimination was not the motivation behind plaintiff's termination?

2.     Did the district court err in relying on Collard's statement that she alone made the decision to terminate Karahogitis when such testimony was without foundation and contradicted by other evidence?

3.     Did the district court err in concluding that statements made to Karahogitis and other women were not direct or circumstantial evidence of discrimination?

4.     Did the district court err in concluding that Karahogitis was not treated unfavorably compared to other younger or male workers?

5.     Did the district court err in relying on *Galvan v. City of Bryan*, a 2004 decision interpreting the law prior to the ADA Amendment Act of 2008, to question if Karahogitis' epilepsy was a disability?

6.     Did the district court err in concluding that Karahogitis provided no evidence that her epilepsy constituted a disability in this particular case?

7.     Did the district court err in concluding that Karahogitis failed to assert a connection between her termination and her epilepsy?

8.     Did the district court err in finding that Karahogitis never requested accommodation for her disability?

9.     Did the district court err in concluding that Karahogitis had not established a fact issue regarding whether TPUSA's proffered reasons for her termination were pretext?

10.   Did the district court err in interpreting Karahogitis' agreements with Teleperformance to absolve TPUSA of responsibility for payment of commissions and other amounts owed to Karahogitis?

11.   Did the district court err in concluding that Karahogitis had not established a fact issue regarding her claim of fraud?

## STATEMENT OF THE CASE

This case arises out of an employer's promises to an executive made in order to induce the executive to take another position and move to the United States and subsequent failure to pay amounts owed to that executive and sudden termination of her employment as an act of discrimination under the pretext of "performance issues."

**A.**   **Karahogitis worked within the Teleperformance Group and agreed to receive commissions as part of her compensation.**

The executive, Karahogitis, is a female over 50 years of age with disabilities, including a history of cancer and epilepsy. Beginning in 2013, Karahogitis worked on global contracts for the group of companies owned by Teleperformance SE (collectively, the "***Teleperformance Group***"), which holds itself out as an integrated, global digital business

3

service company that serves over 170 countries worldwide. ROA.3486.[1] Karahogitis performed work through her company, Excaliber International SRL, a Romanian company, which had a Services Agreement (as amended, the "***Services Agreement***") with Ypiresia 800 – Teleperformance A.E. ("***TP Greece***"), a Greek corporation that is part of the Teleperformance Group. *Id.* Clients were told that Karahogitis was a Teleperformance Group employee, and she was given benefits as a Teleperformance Group employee. ROA.3477. Karahogitis' employment had nothing to do with TP Greece other than the fact that she lived there. ROA.3407-3408, 3478.

In or about 2022, the Teleperformance Group developed a 2022 Strategic Account Manager Sales Incentive Plan (the "***2022 SIP***"), ROA.3321-3337, and Karahogitis agreed to participate. ROA.3321. Under the 2022 SIP, Karahogitis' remuneration consisted of a base salary, a farming bonus, a KSAT valuation bonus, and new business commissions. ROA.3322. Incentives were paid on a quarterly basis "in the payroll on the second month following the close of the quarter (May, August, November, February)." ROA.3328. Under the 2022 SIP, if any

---

[1] *See also* https://www.tp.com/en-us/why-tp/about-tp/

plan participant plan was transferred to another assignment within the Teleperformance Group, and that assignment was not covered by the 2022 SIP, then the plan participant was eligible to receive all incentive payments for three quarters. ROA.3327.

**B.    The Teleperformance Group promoted Karahogitis twice in 2022, but then withheld her earned commissions, bonuses, and fees until she signed new employment agreements.**

After working with the Teleperformance Group for nearly a decade, Karahogitis was recruited to a global executive position, Global Deputy Chief Client Officer, in June 2022. ROA.3478. In this role, Karahogitis reported to Miranda Collard ("*Collard*"). ROA.3478-3479. As part of the promotion, the Teleperformance Group required Karahogitis to become an employee and move from Greece to the United States. ROA.3478-3479. Karahogitis relocated her family to Texas.

Following her June 2022 promotion, she was promoted again in November 2022 and assumed the additional role of Chief Client Officer for EMEA (Europe, the Middle East, and Africa) reporting to Joao Cardoso ("*Cardoso*"). ROA.3478-3479.  Thus, Karahogitis had two roles: the Global Deputy Chief Client Officer and the Chief Client Officer for EMEA.

Karahogitis performed exceptionally well in her roles and was repeatedly told she exceeded expectations. Karahogitis' annual performance review for 2022, called the "360-degree review," comprised of input from over two dozen participants, was excellent. ROA.3408, 3481. She was also awarded stock in September 2023 for her continued good performance. ROA.3656.

One of Karahogitis' former colleagues, Koda Skurzewski, worked with her from 2022 through October 2023 and described her as "particularly instrumental in client relationship management and expanding operational growth, often taking on more than her designated responsibilities due to her strength and effectiveness in high-level client interactions." ROA.3403. Another former colleague, Maria Sigacheva, confirmed that Karahogitis "was highly appreciated by colleagues, her direct reports, management team and clients." ROA.3408. Clients valued her enormously, and one of the biggest global clients Phillip Morris, even included Karahogitis as Key Personnel in its contract with Teleperformance. ROA.3408. Phillip Morris commented that Karahogitis "was irreplaceable for that client, and it was really a unique situation in the organization." ROA.3408.

6

Clients likewise confirmed that Karahogitis was a strong performer. For example, Oanh Phuong, the former global leader for HP's Customer Care Center and highest-level decision maker at HP for the Teleperformance relationship, testified that she had a "very, very strong" working relationship with Karahogitis. ROA.3415, 3417. By contrast, Phuong testified that other Teleperformance employees, including Collard, did not perform, account management was "really weak" and the "customer experience was really, really broken" when Collard managed the HP relationship, but "blossomed as soon as Athina was introduced to the picture." ROA.3417-3418. Phuong met with Teleperformance's CEO Daniel Julien and with Collard in May 2023 and referred to her relationship with Karahogitis as "the best investment Teleperformance has made in HP." ROA.3419-3420.

Inexplicably, it took months to complete Karahogitis' new agreements after her promotions. Although Karahogitis was working 90-hour weeks at the time, the Teleperformance Group stopped all payment of her salary, stopped reimbursing her travel expenses, and withheld Karahogitis' past due commissions pending preparation and execution of the agreements. ROA.3479-3480. When Karahogitis told Collard she

7

could not afford to continue to be unpaid, Collard urged Karahogitis to sign and promised orally and in writing that Karahogitis would receive everything they were discussing including the commissions. ROA.3408.

**C. Karahogitis' agreements with the Teleperformance Group.**

Eventually, in February 2023, the agreements were finalized. Teleperformance's Chief Legal and Compliance Officer, Leigh Ryan, assured Karahogitis that Teleperformance would arrange for payment of Karahogitis' 2022 bonus and get her set up in TGI's payroll once she signed the new agreements. ROA.3347-3389; ROA.3479-3480, ROA.3502.

Karahogitis was required to sign a Termination Agreement backdated as of December 31, 2022, which had the effect of terminating the Services Agreement between Excaliber and TP Greece, while simultaneously executing an Employment and Non-Competition Agreement with another Teleperformance entity, Teleperformance Group, Inc. ("*TGI*"), also backdated to January 1, 2023. ROA.3479, ROA.3491-3500.

The Termination Agreement preserved Karahogitis' right to earned fees, commissions, and bonuses from 2022 by stating, in pertinent part, as follows:

WHEREAS, effective as of January 1, 2023, (1) [Karahogitis] shall become an employee of Teleperformance Group, Inc., . . . (the "Company") pursuant to an Employment . . . Agreement . . . and (2) Consultant shall cease (a) providing services to TP Greece pursuant to the Service Agreement and (b) to be entitled to any commissions, bonus or other payments pursuant to the 2022 SIP; <u>provided</u> that [Karahogitis] shall be entitled to a prorated portion of the variable bonus, if any, earned in the role of Global Deputy Chief Client Officer for the period from June 1, 2022 through December 31, 2022, up to a maximum of €116,667;

\*\*\*\*

2.    <u>Termination of 2022 SIP</u>.

a.    Effective as of the close of business Central European time on December 31, 2022, the 2022 SIP and any other SIPs or other commission and/or bonus arrangements to subject to all applicable withholdings which [Karahogitis] may have been a party with any company affiliated with Teleperformance SE (collectively with the 2022 SIP, the "TP SIPs") are hereby terminated and of no further force and effect. From and after December 31, 2022, neither TP Greece nor any other company affiliated with Teleperformance SE shall have any obligations to [Karahogitis] under the 2022 SIP *<u>except</u> for (i) payment of the commissions and bonuses based on farming targets and K-Sat, if any, due to [Karahogitis] under the 2022 SIP for the last two (2) calendar quarters of the fiscal year ended December 31, 2022, subject to [Karahogitis'] submission of all applicable documentation with respect thereto on or before March 15, 2023 and approval thereof as contemplated by the 2022 [Sales Incentive Plan]* […].

b.    [Karahogitis] agrees to submit to TP Greece

9

on or before March 15, 2023 accurate and complete documentation, as required by the Service Agreement and the 2022 [Sales Incentive Plan], with respect to any and all fees, commissions and/or bonuses earned by [Karahogitis] […].

ROA.3339-3340 (underlines in original; italics added).

## D. Teleperformance then decided that Karahogitis should be an employee of TPUSA, not TGI.

In March 2023, Ryan decided that Karahogitis' should be an employee of TPUSA, Inc. ("*TPUSA*"), not TGI. Thus, Teleperformance had Karahogitis enter into an Amended and Restated Employment and Non-Competition Agreement (the "*Amended Employment Agreement*") with TPUSA. ROA.3480-3481, ROA.3545.

As before, the Amended Employment Agreement preserved Karahogitis' right to earned fees, commissions, and bonuses from 2022:

> WHEREAS, in connection with Employee's *promotion* to the position of Global Deputy Chief Client Officer ("Global Deputy CCO") of the group of companies owned by Teleperformance SE (collectively, the Teleperformance Group") (1) pursuant to the Termination Letter in the form attached hereto as Schedule 1 and effective as of December 31, 2022, TP Greece [and Karahogitis] desire to terminate (a) the Service Agreement with no continuing obligations thereunder except for (i) TP Greece's obligation to pay to [Karahogitis] (A) fees for services rendered through December 31, 2022, subject to all applicable withholdings, and (B) reimbursement of fuel, telephone

10

and travel expenses . . . (b) the 2022 SIP with no continuing obligations thereunder _except_ *for (i) payment of the commissions and bonuses based on farming targets and K-Sat, if any, due to [Karahogitis] under the 2022 SIP for the last two (2) calendar quarters of the fiscal year ended December 31, 2022, subject to [Karahogitis'] submission of all applicable documentation with respect thereto on or before March 15, 2023 and approval thereof as contemplated by the 2022 SIP* […].
****

ROA.3354-3355 (underlines in original; italics added).

It also confirmed that Karahogitis would be performing services for the global Teleperformance Group:

2. <u>Position, Services and Exclusivity of Services</u>.

(a) <u>Position</u>. Company shall employ [Karahogitis] as the Global Deputy CCO *of the Teleperformance Group or in such other capacity or capacities as may be directed by the Global CCO, the Global COO or a member of the Teleperformance Group senior management team*[.]

ROA.3355.

**E. In April 2023, Teleperformance reneged on its promise to pay Karahogitis her earned commissions, bonuses, and fees.**

Almost immediately after Karahogitis signed the new contracts, the Teleperformance Group reneged on its agreement to pay Karahogitis her commissions. The Chief Financial Officer for EMEA, Kelly Grypari, took the position that Karahogitis forfeited any commissions earned before

December 2022, but to be paid after January 1, 2023, by signing the Termination Agreement, such that Karahogitis was not entitled to the commissions she earned in 2022. ROA.3425-3434.

Karahogitis had numerous discussions with Collard and others about this issue. ROA.3480.   Collard acknowledged that "[i]t's not unusual for [past commissions] to not be in [a new employment] contract because the contract is a look forward for 2023 forward and not in reverse . . ." ROA.3393.   She further acknowledged that Teleperformance had agreed to continue paying commissions "to help compensate for the taxation issues from your Romanian contract and having to become a TP employee," which "was a 300k impact . . . ."   ROA.3393. Collard told Karahogitis, "[s]ince you are paid out of the US, I'm happy to help get this out once resolved with Joao and Dinos." ROA.3393.

In emails, Matthew Cuthill, Teleperformance's Director of Digital Transformation – Finance, confirming that "everything [Karahogitis] worked on while under [her] SAM role will be paid out," … "so the payments would stop only once the 2 years for the normal SAM commission or 4 years for the BD commission has run its course," which meant they would continue "potentially until 2026." ROA.3481, 3491-

3500. Collard also acknowledged that Karahogitis was also entitled to additional commissions for the first two quarters of 2023 as "part of her existing agreement, so those should be good to go." ROA.3392. Karahogitis forwarded those emails to Grypari, who determined that an amendment to the existing agreement would be needed to address the commissions that Grypari felt were not covered by the existing agreements. ROA.3391.

Collard ultimately authorized a change to the Termination Agreement to reflect that Karahogitis would be "eligible to be paid commissions under the 2022 SIP for Q1 and Q2 2023 (in addition to the commissions for Q3 and Q4 2022, which have been paid in full) as long as [Karahogitis] submit[ted] all required documentation by July 31, 2023." ROA.3480-3481 ROA.3491-3494. Karahogitis then entered into a First Amendment to Termination Agreement ("*First Amendment*") dated as of July 20, 2023, affirming that Karahogitis would receive her commissions so long as she submitted documentation by July 31, 2023. ROA.3480-3481, ROA.3343-3345. Section 2(a) of the original Termination Agreement was replaced with the following:

> Effective . . . December 31, 2022, the 2022 SIP and any other SIPs or other commission and/or bonus

arrangements to which [Karahogitis] may have been a party with any company affiliated with Teleperformance SE […] are hereby terminated and of no further force and effect. From and after December 31, 2022, neither TP Greece nor any other company affiliated with Teleperformance SE shall have any obligations to [Karahogitis] under the SIP *except for (i) payment of the commissions and bonuses based on farming targets and K-Sat, if any, due to [Karahogitis] under the 2022 SIP for the last two (2) calendar quarters of the fiscal year ended December 31, 2022 and the first two (2) calendar quarters of the fiscal year ended December 31, 2023, subject to [Karahogitis'] submission of all applicable documentation with respect thereto on or before July 31, 2023 and approval thereof as contemplated by the 2022 SIP . . . .*

ROA.3343-3345 (italics added).

Karahogitis submitted the required documentation well before the July 31, 2023, deadline, and then generated a courtesy invoice reflecting the amounts owed – something not required by Teleperformance but had been done customarily to reflect what had been submitted. ROA.3481; ROA.3440-3441; ROA.3444-3447. Yet, Teleperformance still refused to pay.

## F. Karahogitis endured inappropriate comments and unfair treatment because of her sex, disability, and age.

After moving to Texas, it became apparent that TPUSA was concerned about the cost of Karahogitis' healthcare – Karahogitis is a

cancer survivor and suffers from epilepsy – based on management's comments about "healthcare costs" and "the need to focus on younger workers." ROA.3482-3483. Further, Karahogitis noticed that female employees were being pushed out of the organization and lied to about the redundancy of their positions, when their duties were transferred wholesale to another person. ROA.3482-3483.

Karahogitis also endured poor treatment, which she noticed that only she and other females experienced. For example, Karahogitis presented to EMEA team members in the Dominican Republic in April 2023. ROA.3485-3486. She was "attacked on something that [she] didn't realize at the time was happening" and "felt bullied," leading her to freeze during the presentation for the first time, despite having presented in front of the CEO, Julien, before without issue. ROA.3406.  Further, Karahogitis and other witness observed that Cardoso and Augusto Martinez would interrupt and talk over women; would interrupt and express disbelief when women would describe solutions routed in objective third party data; telling Karahogitis to "do less for women;" and Norbert Van Liemt would use a very disrespectful tone towards her and cut her and other team members off. ROA.3485-3486.

15

The mistreatment was so severe that Sigacheva, a female who worked with Karahogitis on the EMEA team, was surprised on a company-wide call when Julien "mentioned [Karahogitis] as Teleperformance star employee setting example for others in his global webinars for management teams." ROA.3409. This was surprising because "[u]sually, the only comments about women were about their beauty or attractiveness[;] the comments about [Karahogitis] were something exceptional as Daniel Julien did not make such statements often about others, especially women." She further stated that Julien "often evaluated highly beauty of women employees. Most global meetings she and Karahogitis were required to attend ended with videos of provocative female performances that Daniel Julien called 'gifts' for all participants." ROA.3409.[2]

Koda Skurzewski, a female who worked at Teleperformance from July 2022 to October 2023 and served as a Chief Revenue Officer for GAMMA (Google, Amazon, Meta, Microsoft, and Apple), observed a

---

[2] The district court ignored this treatment apparently assuming that TPUSA could not be liable for forcing its employees to be subjected to the discriminatory conduct since many of the actors were employees of the parent company. However, Karahogitis performed services for the global Teleperformance Group and reported to the Global CCO, COO, and other members of the global group's senior management team, per the express language of her contract. ROA.3355.

16

consistent and troubling pattern of discriminatory treatment toward women. ROA.3401-3402. During Karahogitis' tenure, women were regularly marginalized, excluded from key opportunities, and treated disrespectfully. Men would claim credit for successes that women had achieved. It happened so often that she perceived it to be the norm rather than the exception. ROA.3401-3405.

Multiple women testified that women were forced out of the company. ROA.3403. Skurzewski testified that she and other women were promised commissions to induce them to accept roles, which were then never paid. ROA.3402-3403. It was part of a pattern of how senior-level female leaders were treated, including former Executive Vice Presidents Rhonda Gibler and Brandy Presti, who were forced to resign following months of Teleperformance's continued failure to pay commission payments. Meanwhile, male counterparts and subordinates continued to be compensated fairly and received clear career paths and new roles when any changes were made. ROA.3402-3403.

Skurzewski also confirmed that complaints about the disrespectful attitudes towards women, unequal pay and support, and breaches of promised commission payments were raised during several TP Women

Initiative events and meetings over the 2022 to 2024 timeframe where Miranda Collard was the chair. ROA.3403. No solution to the problem was offered by Collard. ROA.3403.

Mara Bouklia, Karahogitis' executive assistant starting in June of 2022 until Karahogitis' termination, likewise confirmed that discrimination occurred at TPUSA. ROA.3436-3443.  She testified that during many Zoom meetings which Karahogitis was required to attend, and Bouklia attended to assist her, Cardoso and Augusto were offensive. ROA.3441-3442.  The tone and attitude towards women including Karahogitis was disrespectful. ROA.3441-3442.  Both Cardoso and Augusto would interrupt and talk over women, and the tone was aggressive and disrespectful. ROA.3441-3442. In almost every meeting, inappropriate comments directed at the women included "women stop talking" or "You are having technical difficulties, I am going to mute you" when there were clearly no technical issues. ROA.3441-3442.

Importantly, Cardoso was directly involved in the decision to terminate Karahogitis' employment. Cardoso is Managing Director and CEO of Teleperformance Portugal and also served as President of EMEA for Teleperformance Group in 2023 and 2024. TPUSA's privilege log in

18

this case indicates that Cardoso was consulted about, and involved in, TPUSA's decision to terminate Karahogitis' employment. ROA.3449-3451. The privilege log reveals that in the weeks leading up to Karahogitis' termination, Cardoso compiled emails he exchanged with Karahogitis regarding Karahogitis' attendance at meetings, responses to criticism, and general job performance – the same emails TPUSA then used as pretext on summary judgment to justify Karahogitis' termination. ROA.3449-3451, ROA.856-860.

**G. TPUSA eliminated Karahogitis' global position as "redundant" in September 2023, and then terminated her from both her roles in November 2023, offering ever-changing explanations for the sudden termination and replacing her with a male.**

In September 2023, Collard informed Karahogitis that the global office was being eliminated and her clients would be taken away from her and moved to a different business "vertical." ROA.862-863. Then, just two months later, on November 29, 2023, and without the requisite six-months' notice, Karahogitis was fired from both of her positions with TPUSA and Teleperformance. ROA.3485. With respect to her role in EMEA, Karahogitis was replaced by a male, Alvaro Buesa. ROA.3485.

When asked the reason for her termination from TPUSA, TPUSA

19

first claimed that Karahogitis was terminated because her global position was being eliminated. Then, TPUSA claimed her role was made "redundant" and they could not find a new home for her. TPUSA refused to provide the list showing to whom her clients were transferred or any evidence as to how her role was redundant, and Collard's declaration provided no evidentiary support as to that point. ROA.3485. Furthermore, the two males in that role were not terminated. Will Fritcher remained in his role, and the other male, Gustavo Mir González, was given another role within the Teleperformance organization in the summer of 2023. ROA.869.

At summary judgment, TPUSA offered yet another reason for the termination of Karahogitis' employment – poor performance and missed meetings with Cardoso. ROA.735-736. However, Karahogitis only missed meetings when (a) she prioritized client meetings, and (b) when she was in the hospital. Four independent witnesses confirm that client meetings were the top priority and internal meetings were commonly missed because of client meetings or calls. ROA.3401-3402, 3409-3410, 3437, 3441-3442. And, Teleperformance had promoted Karahogitis twice since 2022, awarding her a bonus for her performance in 2022 and stock

in September 2023 based on her performance.

## SUMMARY OF THE ARGUMENT

Based on TPUSA's shifting explanations surrounding Karahogitis' termination, failure to pay her amounts owed, and the treatment she endured because of her protected characteristics, Karahogitis brought this lawsuit against TPUSA on July 9, 2024, asserting sex, age, and disability discrimination, a breach of contract claim, and fraud. This district court disposed of all of these claims on summary judgment, however.

The district court's summary judgment should be reversed for a host of reasons. The district court erred in: (1) relying on the "same actor" defense and accepting Collard's statements that she alone made the decision to hire and fire Karahogitis from her positions as Chief Client Officer for EMEA and Global Deputy Chief Client Officer,[3] especially in light of the evidence that others, including Joao Cardoso and Augusto Martinez, were consulting in the two weeks leading up to Karahogitis' termination as reflected in TPUSA's privilege log; (2) concluding that

---

[3] TPUSA has offered no reason with or without foundation, let alone a legitimate business reason for eliminating Plaintiff's position of GDCCO

21

comments and disparate treatment of Karahogitis and other women, and older workers, were not sufficient direct or circumstantial evidence of discrimination; (3) disregarding fact issues as to whether Karahogitis was treated differently compared to younger or male workers; (4) relying on cases prior to the enactment of the ADA Amendment Act of 2008 to question whether Karahogitis' epilepsy was a disability and ignoring current law; (5) finding that Karahogitis failed to establish a connection between her disability – epilepsy – and her termination; (6) finding that Karahogitis had not requested an accommodation; (7) finding that the elimination of Karahogitis' position was justified by a legitimate business reason when no reason was offered and evidence showed the reasons for Karahogitis' termination were pretextual; (8) misinterpreting Karahogitis' agreements with Teleperformance and its affiliates, and (9) finding that Karahogitis failed to raise a triable issue on her fraud claim.

## STANDARD OF REVIEW

"This court reviews a grant of summary judgment *de novo*, applying the same standard as the district court." *Jones v. New Orleans Reg'l Physician Hosp. Org., Inc.*, 981 F.3d 428, 432 (5th Cir. 2020). Under Rule 56 of the FRCP, summary judgment is proper "if the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court reviews all evidence and draws all reasonable inferences in the light most favorable to the nonmovant. *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015). The interpretation of a contract is a legal question reviewed de novo, subject to governing state law. *Capio Funding, L.L.C. v. Rural/Metro Operating Co., L.L.C.*, 35 F.4th 353, 356 (5th Cir. 2022).

## ARGUMENT

### A.    Karahogitis' discrimination claims.

A Title VII, ADA, and ADEA plaintiff may prove discrimination either by direct or circumstantial evidence. *See McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007) (Title VII); *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019) (ADA); *Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386, 388-89 (5th Cir. 2020) (ADEA). Both were present here, as is discussed more fully below.

23

**i.    The "same actor" defense does not rule out Karahogitis' ability to prove her discrimination claims.**

As a preliminary matter, the district court incorrectly inferred that discrimination was not the motive behind Karahogitis' termination based on the "same actor" defense. ROA.3710-3712.  The "same actor" defense involves the situation where "the individual who allegedly discriminated against the plaintiff was the same individual who hired the plaintiff" and it "gives rise to an inference that discrimination was not the motive behind plaintiff's termination." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 228 n. 16 (5th Cir. 2000).

Importantly, the same actor defense "simply gives rise to an inference; it does not 'rule out the possibility that an individual could prove a case of discrimination.'" *Bautista v. Quest Diagnostics Clinical Labs., Inc.*, No. H-11-4162, 2013 U.S. Dist. LEXIS 124236 (S.D. Tex. Aug. 30, 2013) (quoting *Russell*, 235 F.3d at 228 n. 16).  In *Bautista*, for example, the trial court rejected the "same actor" inference in denying the defendants' motion for summary judgment on the plaintiff's age discrimination claim. *Id.* at *16-19. The trial court stated that it was unclear from the record whether the same group of individuals were

responsible for hiring and firing the plaintiff, and because there were a number of individuals involved in the decision to terminate the plaintiff's employment (some of whom were not involved the decision to hire her), then the "same actor" inference was inapplicable. *Id.* at \*17 (citing *Black v. Pan Am. Labs., L.L.C.*, 646 F.3d 254, 260 n.4 (5th Cir. 2011)).

The court reached the same result in *Eyob v. Mitsubishi Caterpillar Forklift Am., Inc.*, No. H-16-1688, 2017 U.S. Dist. LEXIS 118574, at \*14 (S.D. Tex. 2017). There, the court held that there was a fact issue about who was actually responsible for promoting the employee and, thus, declined to apply the same actor inference.

Here, TPUSA argued that a lone individual – Collard – made the decisions to hire and terminate Karahogitis. ROA.753-754. However, as in *Bautista* and *Eyob*, there was at least fact issue about who was really responsible for promoting and terminating Karahogitis. The evidence offered by Karahogitis showed that there were additional individuals involved in the decision to hire and promote Karahogitis beyond Collard, including the CEO, Julien and CCO, Grisanti. ROA.1161-1162. And, Karahogitis testified that Collard broadly informed her, orally and in writing, that "the Teleperformance Group had decided to terminate" her,

25

not TPUSA or Collard personally. ROA.1235. And, as discussed above, Cardoso was clearly consulted about the decision to terminate Karahogitis' employment. ROA.1476-1477, ROA.3449-3450. Hence, there were genuine issues of material fact regarding the actors who decided to hire and fire Karahogitis, rendering the "same actor" inference inapplicable.

The district court erred by applying the same actor defense, and this error influenced other incorrect decisions reached by the district court. For example, the district court held that unfavorable comments and disrespect towards females and older workers could not serve as evidence of discriminatory animus because the people who made those comments, including Cardoso, Grisanti, and Julian, did not have any influence over Collard's decision to terminate Karahogitis. The district court therefore erred by viewing all of Karahogitis' claims under the lens of the "same actor" defense.

### ii. Direct evidence supporting Karahogitis' discrimination claims.

The district court also erred in holding that there was no direct evidence of discrimination. Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or

presumption. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). In the Title VII context, direct evidence includes any statement or document that shows on its face that an improper criterion served as a basis for the adverse employment action. *Harry v. Dallas Hous. Auth.*, 662 Fed. Appx. 263, 266 (5th Cir. 2016).

Workplace comments qualify as direct evidence of discrimination if the comment is "direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that age was an impermissible factor in the [adverse employment action]." *E.E.O.C. v. Tex. Instruments Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996). Workplace comments provide sufficient evidence of discrimination if they are (1) related plaintiff protected class; (2) proximate in time to the adverse action; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue. *See Moss v. BMC Software Inc.*, 610 F.3d 917, 929 (5th Cir. 2010). Discriminatory remarks may be considered "even where the comment is not in the direct context of the termination and even if uttered by one other than the formal decision maker, provided that the individual is in a position to influence the decision." *Palasota v. Haggar Clothing Co.*, 342

27

F.3d 569, 578 (5th Cir. 2003).

Karahogitis proffered direct evidence supporting her sex, age and disability discrimination claims. As to her sex discrimination claims, Karahogitis and four other witnesses testified about discriminatory conduct by men, as discussed more fully in Section F above. ROA.3401-3405, 3409, 3436-3443, 3485-3486. The tone and attitude towards women, including Karahogitis, was extremely disrespectful, aggressive, and inappropriate.

The people making the comments included decisionmakers that were involved in Karahogitis' termination. The evidence showed that Cardoso was consulted in the weeks leading up to Karahogitis' termination and asked to compile emails regarding Karahogitis' attendance at meetings, responses to criticism, and general job performance – the same emails TPUSA then used as pretext to justify Karahogitis' termination. Thus, his discriminatory remarks may be considered even though his comments may not have been in the direct context of the termination since he was in a position to influence the decision. *See Palasota*, 342 F.3d at 578. Yet, the district court erroneously ignored the comments, assuming Collard was the only

28

involved in the decision to terminate Karahogitis.

The district court also erred in holding that there was no evidence that the comments were made proximate in time to Karahogitis' termination. ROA.3713. Bouklia testified she only worked for Karahogitis from June 2022 to November 2023. ROA.3436. Therefore, all comments heard by her and conduct observed by her took place within the last 15 months of Karahogitis' employment.

As to her age discrimination claims, former TPUSA Executive Vice President of Strategic Accounts, David Minkus, 65 at the time of his termination, explained the longstanding history of age discrimination including comments he received from Collard ("we talk about your dog and your new grandson and it seemed that you were getting ready for that next stage;" she "needed to make organization decisions with a 20 year view, not 3-5 years;" and that the then-Teleperformance COO called the Strategic Account Management Group the "gray hairs;"), and CEO Daniel Julien ("You know what I love about your organization, Miranda? It is all young people in their 40s. Well, maybe a few their 50s, but not anyone old or in their 60s!"). ROA.3467-3474. The evidence was that the discriminatory preference of younger workers continued through

29

Karahogitis' termination. ROA.3442-3443, 3482-3483. The district court erroneously ignored this evidence, however, inexplicably holding it was not proximate in time to Karahogitis' termination.

### iii. Circumstantial evidence also supports Karahogitis' discrimination claims.

Additionally or alternatively, there was sufficient circumstantial evidence to create a genuine issue of material fact with respect to each of Karahogitis' claims for sex, disability, and age discrimination. Where a plaintiff relies on circumstantial evidence to support a discrimination claim, the claim is properly analyzed under the *McDonnell Douglas* burden-shifting framework. *See Smith v. City of St. Martinville*, 575 Fed. Appx. 435, 438 (5th Cir. 2014) (per curiam) (Title VII); *Allen v. USPS*, 63 F.4th 292, 300 (5th Cir. 2023) (ADEA). Under this framework, the plaintiff must first establish a *prima facie* case of discrimination, which "creates a presumption that [Defendant] unlawfully discriminated against" the plaintiff. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

Workplace comments may qualify as indirect evidence of discrimination. In indirect evidence cases, courts apply a less demanding standard because "the discriminatory remarks are just one ingredient in

30

the overall evidentiary mix." *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 475 (5th Cir. 2015) (holding that discriminatory remarks are relevant at the pretext stage and a less "demanding test applies"). Under this less demanding standard, the plaintiff must show that the comments involve "(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *McMichael v. Transocean Offshore*, 934 F.3d 447, 457-58 (5th Cir. 2019).

If the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment actions taken. *See St. Mary's Honor Ctr.*, 509 U.S. at 506-07. If the defendant meets its production burden, the plaintiff may prove intentional discrimination by proceeding under one of two alternatives: the pretext alternative or the mixed-motives alternative. *See Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

Under the pretext alternative, the plaintiff must "offer sufficient evidence to create a genuine issue of material fact ... that [Defendant's] reason is not true, but is instead a pretext for discrimination[.]" *Rachid,*

31

376 F.3d at 312 (citation and internal quotation marks omitted). "Pretext is established 'either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence.'" *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 480 (5th Cir. 2016). Under the comparatively rare mixed-motives alternative, the plaintiff must offer sufficient evidence to create a genuine factual issue concerning whether Defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic. *Id.*

### a.    *Sex discrimination.*

The *prima facie* showing for a claim of sex discrimination under Title VII requires the plaintiff to produce evidence to show that: (1) she is a member of a protected class, (2) she was qualified for the position, (3) she was the subject of an adverse employment action, and (4) she was treated less favorably ... than were similarly situated employees who were not members of the protected class, under nearly identical circumstances. *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009).

It is undisputed that Karahogitis suffered an adverse employment

action due to her November 29, 2023, termination, was qualified for her Global Deputy Chief Client Officer and the Chief Client Officer for EMEA positions,[4] was within the protected class under Title VII. And, the summary-judgment evidence offered by Karahogitis, discussed more fully in Section F above, was sufficient circumstantial evidence to establish a *prima facie* case for sex discrimination given the unfavorable treatment of females, including Karahogitis.

From 2022 through her termination, Cardoso and Martinez would interrupt and talk over women; would interrupt and express disbelief when women would describe solutions routed in objective third party data; told Karahogitis to "do less for women;" and permitted others, including Norbert Van Liemt, to use a very disrespectful tone towards her and cut her and other team members off. The CEO usually only made comments about women's beauty or attractiveness, promised but never paid promised commissions, were offensive and disrespectful towards women, explicitly stating "stop talking" and muting women on

---

[4] In its summary judgment motion, TPUSA never disputed that Karahogitis was a qualified individual; it simply states, in attempting to address Karahogitis' disability discrimination claim, that Karahogitis is not "qualified individual with a disability." [Dkt. 58', p. 29. This assertion, without evidence, did not entitle TPUSA to summary judgment on Karahogitis' discrimination claims.

calls, men who were terminated were offered more generous packages and allowed long notice periods so men could vest in stock. Whereas women, like Sigacheva and Karahogitis, were simply terminated without notice.

A factual dispute existed, thereby precluding summary judgment on Karahogitis' sex discrimination claim. But, the district court disregarded the comments due to its improper application of the "same actor" defense.

The district court further erroneously held that there was no evidence that Karahogitis was supervised by Julien, the CEO, or Grisanti, the CCO, despite the multiple employees who testified she was required to attend meetings chaired by them. The district court's ruling also ignored the terms of her Employment Agreements, which expressly provided that she was employed "as the Global Deputy CCO *of the Teleperformance Group* or in such other capacity or capacities as may be *directed by the Global CCO*, the Global COO or a member of the *Teleperformance Group senior management team*," which included both Julien and Grisanti, her "duties shall consist of all responsibilities, assignments and tasks consistent with her position, and as may be

34

required or requested by the Global COO, the Global CCO or a member of the Teleperformance Group senior management team," and that she agree[d] to carry out and perform orders, directions and policies of Company, the Global COO, the Global CCO, and/or any member of the Teleperformance Group senior management team, as the case may be, whether stated orally or in writing." ROA.3355.

The district court also disregarded some of the sexist treatment of other TP executives on the calls Karahogitis was forced to attend because they were employees of parent or subsidiary companies. *See* ROA.3713 ("Mr. Liemt was not even a TPUSA employee). But the law is clear that TPUSA can be liable for the acts of nonemployees. See *Skipper v. Fedex*, No. 3:23-cv-212-E-BN, 2023 U.S. Dist. LEXIS 231696, at *21 (N.D. Tex. Dec. 8, 2023) ("the hostile work environment need not always be created by a supervisor") (citing *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 322 (5th Cir. 2019) ("[N]onemployees can be the source of the harassment. Customers are one example of third-party harassers.")); *see also* 29 C.F.R. § 1604.11(e)); *Neal v. Williamson Cty.*, No. 1:23-cv-759-RP, 2024 U.S. Dist. LEXIS 202224, at *11 (W.D. Tex. Nov. 6, 2024) citing *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 423 (4th Cir. 2014) ("[A]n

35

employer is liable under Title VII for third parties creating a hostile work environment if the employer knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to end the harassment.").

Karahogitis, Skurzewski and other women made complaints about the disrespectful attitudes towards women, unequal pay and support, and breaches of promised commission payments were raised during several TP Women Initiative events and meetings over the 2022 to 2024 timeframe where Miranda Collard was the chair. ROA.3403-3404. But no solution to the problem was offered by Collard or anyone else. ROA.3403-3404. And, Karahogitis was forced to attend these meetings as part of her EMEA role.

Hence, the district court erred in holding that Karahogitis failed to establish a *prima facie* case, and its decision should be reversed accordingly.

### b.    *Disability discrimination.*

To establish a *prima facie* case of discrimination under the Americans with Disabilities Act (ADA), a plaintiff must prove (1) that he or she has a disability, (2) that he or she is qualified for the job, and (3)

that he or she was subjected to an adverse employment action on account of his disability. *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014).

The threshold requirement in an ADA claim is that the plaintiff establish that she has a disability. *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 654 (5th Cir. 2003). To do so, she must show that she suffers from "a physical or mental impairment that substantially limits one or more of [her] major life activities." *See Bragdon v. Abbott*, 524 U.S. 624, 630, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998); 42 U.S.C. § 12102(1). To determine whether a limitation is "substantial," the court may consider the nature and severity of an impairment, its duration or expected duration, and its long-term or expected impact. *Galvan v. City of Bryan*, 367 F. Supp. 2d 1081, 1086 (S.D. Tex. 2004) (citing 29 C.F.R. §§ 1630.2(j)(2)(i)-(iii)).

Epilepsy is a recognized impairment under the ADA. *Id.* at 1087 (collecting cases). Karahogitis' epilepsy is an impairment under the ADA as it is a physiological disorder that affects one or more of her body systems. *See* 29 C.F.R. § 1630.2(h)(1) & (2). The EEOC has listed walking, seeing, caring for oneself, performing manual tasks, hearing, speaking, breathing, and working as major life activities. 29 C.F.R. §

37

1630.2(I).  The Fifth Circuit has also observed that "relapsing-remitting conditions like . . . epilepsy . . . can constitute ADA disabilities depending on the nature of each individual case." *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 618 (5th Cir. 2009); *see also EEOC v. Sara Lee Corp.,* 237 F.3d 349, 352-353 (4th Cir. 2001) (noting that epilepsy is one of the disability conditions that Congress contemplated when it passed the ADA).

Here, the district court erroneously concluded that "it is unclear whether Karahogitis epilepsy constitutes a cognizable disability under the ADA" because, allegedly, there was no evidence showing the severity and nature of epilepsy as an impairment.  ROA.3417.  First, the district court erred in relying on *Galvan v. City of Bryan*, a 2004 decision interpreting the law prior to the ADA Amendment Act of 2008, to question if Karagohitis' epilepsy was a disability. The ADA Amendment Act of 2008 reversed two U.S. Supreme Court decisions, including *Toyota Motor Mfg. Kentucky Inc. v. Williams*, 534 U.S. 184 (2002) upon which the *Galvan* court relied in holding that a plaintiff must prove the severity or nature of her epilepsy. As a result of the statutory changes, the 2013 EEOC guidelines as to epilepsy now states:

38

> As a result of changes made by the ADA, individuals who have epilepsy should easily be found to have a disability within the meaning of the first part of the ADA definition of disability because they are substantially limited in neurological functions and other major life activities (for example, speaking or interacting with others) when seizures occur. Additionally, because the determination of whether an impairment is a disability is made without regard to the ameliorative effects of mitigating measures, epilepsy is a disability even if medication or surgery limits the frequency or severity of seizures or eliminates them all together.

U.S. Equal Employment Opportunity Commission, *Epilepsy in the Workplace and the ADA* (2013).[5]

Second, there were multiple witnesses who testified about the nature and severity of Karahogitis' seizures resulting from her travel schedule and inability to sleep, that her epilepsy caused her inability to participate in video zoom calls because of her need to limit her exposure to certain kinds of light, and her inability to drive at night. ROA.3403-3404, ROA.3437-3439. Furthermore, Karahogitis herself testified that her ability to care for herself, perform manual tasks, walk, and learn are impaired during her seizures. ROA.3484-3485. She cannot drive.

---

[5] Available at https://www.eeoc.gov/laws/guidance/epilepsy-workplace-and-ada (last accessed Dec. 3, 2025).

ROA.3484-3485. She cannot perform much of her life functions without being impacted by epilepsy. ROA.3484-3485.

Courts also recognize that sleeping is a major life activity. While an average person might be able to go without sufficient sleep for a few days, Karahogitis could not. The impact of her inability to forgo sleep was not disputed. Bouklia described two epileptic episodes within the year and one half she worked for Karahogitis from June 2022 through November 2023. ROA.3437-3439. At a minimum, this created a genuine issue of material fact as to whether Karahogitis had a disability within the meaning of the ADA.

Karahogitis also offered sufficient evidence to show that she was discriminated against on the basis of this disability. "To prove discrimination, an employee must show that the employer knew of such employee's substantial physical or mental limitation." *Taylor v. Principal Fin. Group*, 93 F.3d 155, 163 (5th Cir. 1997). "If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one." *Id.* at 165. But "a plaintiff need not request, or even know, the particular reasonable accommodation [s]he ultimately requires." *Windham v. Harris Cnty.*, 875 F.3d 229, 237 n.11 (5th Cir. 2017). Instead,

"[t]hat judgment 'is best determined through a flexible, interactive process' involving both the plaintiff and the public entity." *Id.* (quoting *Taylor*, 93 F.3d at 165). Where an employer does not engage in that good-faith, interactive process, the employer violates the ADA. *Cutrera v. Bd. of Supervisors of La. St. Univ.*, 429 F.3d 108, 112 (5th Cir. 2005).

Here, Karahogitis' colleagues confirmed that "[i]t was well known that [Karahogitis] had epilepsy and needed to be careful because of her heavy client travel schedule." ROA.3403. Skurzewski, for example, "learned it within weeks of starting to work with Athina." ROA.3403-3404. She stated that Karahogitis "was very professional about how she dealt with it, but she needed to travel business class in order to get enough hours of sleep." ROA.3403-3404. She also confirmed that Karahogitis sometimes needed to wear sunglasses if she was involved in lengthy video conferences to control her exposure to continuous screen time and light. ROA.3403-3404. Sigacheva confirmed that Karahogitis was "open and professional about her health problems in calls with the teams and clients, and even when she was limiting her exposure to computer screens, she was completely reliable, prepared and fully engaged in all calls." ROA.3404.

Bouklia likewise confirmed that TPUSA was aware of Karahogitis' disability. Bouklia told Collard and Collard's assistant, Amber Preis, that Karahogitis needed to travel business class because of her epilepsy. ROA.3437-3438. Bouklia knew that Karahogitis needed to get eight hours of sleep and that Karahogitis' calendar was so packed she was usually not able to stop at a hotel and rest before her next client meeting. ROA.3437. Thus, Bouklia had conversations with Preis on numerous occasions about making sure Karahogitis was able to sleep on the plane. ROA.3437-3438.

Preis stated she was concerned as well because she was aware of the previous epileptic seizure. ROA.3438. Preis also confirmed that she and Collard already knew about Karahogitis' epilepsy, as Collard needed to approve any changes to Karahogitis' travel class and Preis needed to provide the reason for the change. ROA.3438. Bouklia also testified that there are at least two Teams chats related specifically to Karahogitis' epilepsy and seizures at work, and additional chats about last minute requests from clients or supervisors for Karahogitis to travel and Bouklia corresponding need to obtain approval for business class travel so Karahogitis could sleep. ROA.3438.

42

Bouklia also testified that she had specific discussions with Preis about Karahogitis' epilepsy after she was on a trip and she had non-stop meetings and travel. ROA.3438-3439. Several days into the trip, Bouklia texted Preis on Teams and said Karahogitis needed to be upgraded on the next flight, even though the flight was less than four hours, as Karahogitis had experienced an epileptic seizure and was at the point of exhaustion. ROA.3438-3439.  Preis said she had to talk to Collard to get the approval.  ROA.3439.

Bouklia further testified that Collard also knew about Karahogitis' epilepsy and its effect on her work. ROA.3439.[6] Bouklia testified that attended meetings of Collard's team during which Karahogitis had to wear sunglasses to avoid too much exposure to light and the screen and that on a few occasions, Karahogitis apologized and said that she could not turn on her screen at all due to her epilepsy.  ROA.3439.

The evidence also showed that Karahogitis was discriminated against on the basis of this disability.  The district court erroneously held that "Karahogitis's response does not present arguments on the failure

---

[6] Collard testified that she was unaware of Karahogitis' epilepsy, ROA.1474-1476, and the testimony of the other witnesses would allow a jury to disbelieve other parts or all of her testimony.

to accommodate claim" and granted summary judgment on that basis. ROA.3716. Yet, the evidence showed that Karahogitis was denied her expressly requested accommodation – business class travel to accommodate her need to sleep. All costs for Karahogitis and her team were specifically approved by Collard, except that travel was usually approved by her assistant, Preis. ROA.3437. Karahogitis' travel schedule was so packed she usually was not able to stop at a hotel and rest before the next meeting. ROA.3404, 3409-3410. Collard knew of Karahogitis' packed travel schedule, as she had to approve all travel, and Collard and her assistant, Preis, also had access to Plaintiff's calendar and could confirm it at any time. ROA.3437. Yet, on multiple occasions, Karahogitis was denied her expressly requested accommodation – business class travel to accommodate her need to sleep – while men were allowed to travel business class because of their size – a non-disabling condition. ROA.3437-3438.

There district court also erroneous held that Karahogitis did not connect her disability to her termination. ROA.3715. Karahogitis testified that "[her] costs, including [her] healthcare costs, were being rebilled to TPUSA" and that "[c]omments were made by HR about how

44

expensive preexisting conditions would be . . . ." ROA.3485. She further testified that Teleperformance did not timely offer her medical coverage, but when it was finally offered in early November 2023 and she fully disclosed the extent of her treatments, she was terminated within weeks. ROA.3485. The district court thus erred in its conclusion that no jury could find from this evidence failure to accommodate and discrimination on the basis of disability.

### c.    *Age discrimination.*

The district court also erred with respect to Karahogitis' age discrimination claim. Karahogitis offered evidence that for the five years preceding her termination, including during her time at TPUSA, she and other employees older than 40 were treated less favorably and terminated because of age. For example, her colleague, Minkus, was terminated at the age of 65, with Chief Human Resources Officer Alan Winters stating that "at this point in [Minkus'] career, it did not make sense to have [Minkus] to have him get started on something else." ROA.3474. Further, TPUSA created a group of "up and coming younger management resources within" Teleperformance called "Top 100 Under 45," where many individuals over the age of 45 "were not included in the

group in spite of having better qualifications than those who were." ROA.3471.

As importantly, Collard's maintenance of a younger group of executives was praised by Julien, the CEO, who said, "You know what I love about your organization, Miranda. It is all young people, in their 40s. Well maybe a few in their 50s but not anyone old or in their 60s." ROA.3472. These comments continued in 2022 and 2023. ROA.3442-3443, 3482-3483. They were so pervasive older managers made sarcastic remarks during meetings indicating their objections and belief this preference was discriminatory. ROA.3442-3443.

Additionally, courts have found that a plaintiff made out a *prima facie* age discrimination case where the plaintiff argued that someone younger "effectively replaced" him when the younger employee assumed his accounts and attempted to sell products or provide services to those accounts. *Florer v. Elec. Data Sys. Corp.*, No. 3:03-cv-1175-H, 2004 U.S. Dist. LEXIS 16854, *10-11 (N.D. Tex. Aug. 24, 2004). That is exactly what happened here. After Karahogitis was terminated, TPUSA claims her accounts were distributed to the rest of Collard's team, all but one of whom are younger than Karahogitis. TPUSA asked the district court to

46

ignore these comparators, focus on only one -- Gustavo Mir -- and then argue, without authority, that the "minimal age difference between [Karahogitis] and Mir is insufficient as a matter of law to support an inference of age discrimination." ROA.742.

The district court declined this invitation, however, and held that Karahogitis had established a *prima facie* case for age discrimination. ROA.3718. The district court erred, however, by holding that TPUSA offered a legitimate non-discriminatory reason for Karahogitis' termination – poor performance. ROA.3408. As is discussed below, this justification was mere pretext.

### iv. TPUSA's articulated reason(s) for terminating Karahogitis are pretextual.

Because Karahogitis established a *prima facie* case on all of her discrimination claims, the burden of production shifted to TPUSA to articulate a legitimate, nondiscriminatory reason for the employment actions taken. TPUSA tried to do so by claiming Karahogitis' employment was terminated due to poor performance. However, this so-called nondiscriminatory reason was mere pretext.

A plaintiff may establish pretext by showing that the employer's proffered explanation is false or unworthy of credence. *Reeves v.*

47

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).  In *Dabbasi v. Motiva Enters. LLC*, 107 F.4th 500, 507 (5th Cir. 2024), for example, Dabbasi was terminated for "unsatisfactory performance ratings and evaluations, poor attitude, and failure to improve." *Id.* at 507.  But, the Court found that these non-discriminatory reasons provided by Motiva might have lacked credibility before a fact finder. *Id.* Dabbasi had offered evidence of verbal statements by upper-level management indicating that younger people were the desired class for rotations. *Id.* This, coupled with Motiva filling coordinator positions with "early-career employees," also underscored the weight of its proffered reasons. *Id.*  Thus, this Court concluded that a jury might have found Motiva's proffered reasons unworthy of credence.

Here, Karahogitis showed that Teleperformance's proffered reason was pretext in at least three ways. First, Karahogitis offered competent summary judgment evidence rebutting the substance of TPUSA's claims. As discussed more fully in Section B above, the evidence showed that Karahogitis was not considered a poor performer.  To the contrary, she was promoted twice in one year, paid a bonus for her 2022 performance, awarded stock options for performance in September 2023, and received

48

excellent scores on her 360-degree review. The evidence also showed that she was considered a valuable teammate by her colleagues, and received exceptional reviews from the highest level decision makers at the client level.  This suffices to suggest pretext.  *See Laxton v. Gap Inc.*, 333 F.3d 572, 579 (5th Cir. 2003) (direct attack on substance of employer's claim of poor performance is sufficient to permit jury decide whether employer's excuse is pretext).

Moreover, one of the purported bases for Karahogitis' termination, according to Collard and allegedly supported by the Cardoso emails, was that Karahogitis missed meetings. Yet, the evidence was unrefuted that "all of the Executive Team . . . were told that client meetings took priority over internal meetings, especially face to face client meetings, and all of us did not attend internal meetings if there was a scheduled client meeting or even a last-minute request from the client to meet." ROA.3401-3402.  Sigacheva testified that "it was considered normal that any person in business development, sales or client relationship roles could miss an internal call due to travel or client calls or meetings" and that she "has seen many male employees in the organization that missed the calls where their presence was required without even giving a notice

49

of their absence." ROA.3409-3410. Furthermore, she confirmed that Karahogitis "came to client meetings directly from the airport with no opportunity to rest[, yet s]he could be counted on to be on-time and well prepared for all client meetings, she presented very well and was very effective despite her health challenges." ROA.3404. Sigacheva also confirmed that Karahogitis would be expected to miss internal meetings if there was a client meeting to attend, and that Sigacheva never experienced an instance in which Karahogitis "did not promptly join a client call (which was clearly considered a priority over internal calls by the organization), [and] she also tried to join at least a portion of an internal call (unless she was in the air) and follow up for any details or action points of such a call." ROA.3409-3410.

The other alleged justification – failure to meet revenue targets – was also demonstrably false. TPUSA's motion for summary judgment included a series of emails about Karahogitis' alleged failure to meet revenue goals for an account. ROA.848-855. But, the summary-judgment evidence showed that the account and missed revenue goals were attributable to another employee, Mamta Rodriguez, and that Karahogitis actually achieved 100% of her target. ROA.1422-1423.

Furthermore, where an employer claims the termination was due to poor performance, but fails to maintain clear criteria against which terminated and nonterminated individuals may be measured, that is also evidence tending to show that the employer's proffered explanation is false or unworthy of credence. *Gosby v. Apache Indus. Servs., Inc.*, 30 F.4th 523, 528 (5th Cir. 2022). Here, TPUSA was never able to articulate clear criteria supporting why Karahogitis was chosen for termination versus others, which further discredits TPUSA's insistence that no discrimination was involved. "[W]hen an employer offers subjective reasons to justify its termination of an employee, such as its finding that the terminated employee is 'not sufficiently suited for the job' or 'less qualified' than his colleagues, the employer must 'articulate in some detail a more specific reason than its own vague and conclusional feeling about the employee.'" *Wade v. Lyondell-Citgo Ref.*, 2005 U.S. Dist. LEXIS 55244, 2005 WL 8168888 (S.D. Tex. Dec. 20, 2005).

Here, there was no evidence that TPUSA evaluated both retained and discharged employees against any fixed criteria. Indeed, TPUSA did not offer any documentary evidence of assessments for Karahogitis or any of the other team members who were retained during the reorganization.

51

Although the lack of evidence of a meaningful assessment process cannot alone prove that TPUSA discriminated against Karahogitis, "[t]he absence of clear criteria . . . is evidence tending to show that [TPUSA]'s 'proffered explanation is false or 'unworthy of credence.'" *Gosby*, 30 F. 4th at 528 (citing *Delaval*, 824 F.3d at 480 (quoting *Laxton*, 333 F.3d at 578)). Thus, it at least creates a genuine issue of material fact as to whether TPUSA's proffered explanation is pretextual.

Moreover, one of the purported bases for Karahogitis' termination, according to Collard and allegedly supported by the Cardoso emails, was that Karahogitis missed meetings. Yet, the evidence was unrefuted that "all of the Executive Team . . . were told that client meetings took priority over internal meetings, especially face to face client meetings, and all of us did not attend internal meetings if there was a scheduled client meeting or even a last-minute request from the client to meet." ROA.3401-3402. Sigacheva testified that "it was considered normal that any person in business development, sales or client relationship roles could miss an internal call due to travel or client calls or meetings" and that she "has seen many male employees in the organization that missed the calls where their presence was required without even giving a notice

52

of their absence." ROA.3409-3410. Furthermore, she confirmed that Karahogitis "came to client meetings directly from the airport with no opportunity to rest[, yet s]he could be counted on to be on-time and well prepared for all client meetings, she presented very well and was very effective despite her health challenges." ROA.3404. Sigacheva also confirmed that Karahogitis would be expected to miss internal meetings if there was a client meeting, and that Sigacheva never experienced an instance in which Karahogitis "did not promptly join a client call (which was clearly considered a priority over internal calls by the organization), [and] she also tried to join at least a portion of an internal call (unless she was in the air) and follow up for any details or action points of such a call." ROA.3409-3410.

Second, when an employer offers inconsistent explanations for its employment decision at different times, the jury may infer that the employer's proffered reasons are pretextual. *Gosby*, 30 F.4th at 528; *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) ("An employer's inconsistent explanations for an employment decision 'cast doubt' on the truthfulness of those explanations."); *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 412-13 & n.11 (5th Cir. 2007) ("an

53

employer's inconsistent explanations for its employment decisions at different times permits a jury to infer that the employer's proffered reasons are pretextual"); *Staten v. New Palace Casino, LLC*, 187 Fed. Appx. 350, 359 (5th Cir. 2006) (determining summary judgment was improper where the plaintiff produced evidence that the employer's explanation for her non-selection was inconsistent and there were discrepancies between the decisionmaker's affidavit and testimony).

Here, TPUSA first claimed that Karahogitis was terminated because her position was being eliminated as part of organizational restructuring, which happened to only affect her. Then, TPUSA claimed her role was made redundant. Then, at summary judgment, TPUSA offered yet another reason – unspecified performance and reliability issues for which Collard's declaration provided no examples or details. These shifting explanations are sufficient to show that TPUSA's proffered explanation is pretextual. *Gosby*, 30 F.4th at 528; *Rachid*, 376 F.3d at 312 (reversing summary judgment because issues of material fact existed concerning the proffered reason for terminating employee).

Plus, the timing of TPUSA's changing rationale was, in and of itself, probative of pretext. *See Staten*, 187 Fed. Appx. at 359 (*citing Jamarillo*

54

*v. Colo. Judicial Dep't*, 427 F.3d 1303, 1311 (10th Cir. 2005) ("The timing of the change [in the employer's explanation for its decision] has been found to support the inference of pretext when it occurs after significant legal proceedings have occurred."); *Sears Roebuck & Co.*, 243 F.3d at 853 ("[A] factfinder could infer from the late appearance of Sears's current justification that it is a post-hoc rationale, not a legitimate explanation for [its employment decision].")).

Third, if an employer scrambles to create an exculpatory paper trail around the time of the termination, it supports a finding a pretext. *Burton*, 798 F.3d at 237. "Evidence of a sudden and unprecedented campaign to document [an employee's] deficiencies and thus justify a decision that had already made . . . could raise an inference of pretext." *Id.*; *see also Laxton*, 333 F.3d at 582 (evidence of discrimination sufficient where "the jury may have reasonably concluded that [Gap supervisors] solicited and exaggerated complaints from Laxton's assistant managers," and made "an effort to compile a laundry list of violations to justify a predetermined decision to terminate Laxton.").

TPUSA attempted to document Karahogitis' alleged deficiencies and thus justify a decision that had already made when it scrambled to

55

create an exculpatory paper trail in the weeks leading up to her termination. Per TPUSA's privilege log, Collard emailed Cardoso on November 13, 2023, and copied TPUSA's legal team and others. ROA.3449. Grisanti, the Global CCO, also emailed Cardoso the same day. ROA.3450. The next day, Cardoso sent the group of a compilation of emails regarding Karahogitis' attendance at meetings, responses to criticism, and general job performance – the same emails TPUSA then used as pretext to justify Karahogitis' termination. Karahogitis was terminated two weeks later. ROA.3450-3451, ROA.856-860.

These actions are similar to what took place in *Burton v. Freescale Semiconductor*. There, the employer solicited the former employee's supervisors to provide "documentation." One supervisor responded with an e-mail that began with, "Here is what I have on Nicole Burton," and then set forth "a laundry list of violations to justify [the] predetermined decision to terminate" Burton. That, coupled with other evidence that resembles evidence in the record before this Court, was enough to create an inference of pretext.

As importantly, a jury may conclude that Collard should not be believed at all. Collard claimed to not be aware of Karahogitis' epilepsy,

ROA.1474-1476, notwithstanding that numerous witnesses testified that Karahogitis was open about her disability and need for accommodation. ROA.3403-3404, ROA.3437-3439. Collard provided no support for the statements in her declaration, and conceded in her deposition that she has the list of Karahogitis' accounts and to whom they were provided, but did not produce them as proof that all of her accounts were not transferred to younger non-disabled persons. The jury could infer from this that Collard's testimony should not be credited at all.

## B.    Karahogitis' breach of contract claim.

There were also genuine issues of material fact with respect to Karahogitis' claim for breach of contract. The claim focused on her earned commissions, bonuses, and fees, promised relocation benefits, and severance pay due to Karahogitis. TPUSA argued that it is not liable for these payments, hinging its argument on a claim that there was "no agreement between TPUSA and Karahogitis" requiring TPUSA to pay this compensation to Karahogitis. The district court's opinion siding with TPUSA on this issue  sidestepped ample evidence that created a factual dispute.

### i. The First Amendment is unclear and ambiguous, thereby necessitating consideration of parol evidence.

First, Karahogitis' breach of contract claim required the Court to interpret the First Amendment, as the agreement is unclear. Where the contract's language is plain and unambiguous, courts are confined to the four corners of the contract when interpreting the agreement. *E. Tex. Fire Ins. Co. v. Kempner*, 87 Tex. 229, 27 S.W. 122, 122 (Tex. 1894); *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006). However, if the contract is subject to two or more reasonable interpretations, then the contract is ambiguous, thereby permitting a court to consider the parties' interpretations, examine the contract as a whole in light of the circumstances present when the contract was entered, and admit extrinsic evidence. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996); s*ee URI, Inc. v. Kleber Cty.*, 543 S.W.3d 755, 764 (Tex. 2018). "Whether a contract is ambiguous is a question of law." *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). Here, the First Amendment contains at least three ambiguities.

<u>First</u>, the First Amendment is unclear about which entity had an obligation to Karahogitis. It states that "neither TP Greece *nor any other*

58

*company affiliated with Teleperformance SE* shall have any obligations to [Karahogitis] under the 2022 SIP [...]." The First Amendment references the 2022 SIP, but the 2022 SIP makes no reference to TP Greece, TPUSA, Teleperformance SE, or Teleperformance Group, Inc. Rather, the 2022 SIP simply refers to "Teleperformance." ROA.3320-3337. It is anything but clear as to which Teleperformance entity is responsible for paying the compensation due to Karahogitis.

Moreover, per the terms of the 2022 SIP, incentives were to be paid on a quarterly basis, with payment "done in the payroll on the second month following the close of the quarter (May, August, November, February)." ROA.3328. At all relevant times during Q3 and Q4 2022 and Q1 and Q2 2023, Karahogitis was employed by and on the payroll of TPUSA (even though TPUSA withheld her pay until she signed new agreements). This is consistent with what Collard told Karahogitis at the time: "[s]ince you are paid out of the US, I'm happy to help get this out once resolved with Joao and Dinos." ROA.3393. Collard also acknowledged that Karahogitis was also entitled to additional commissions for the first two quarters of 2023 as "part of her existing agreement, so those should be good to go." ROA.3392. Thus, TPUSA is

59

the one who is obligated to pay these amounts to Karahogitis.

Second, the First Amendment does not contain an integration clause, so the Amended Employment Agreement should be examined with the First Amendment. *See First Bank v. Brumitt*, 519 S.W.3d 95, 109-10 (Tex. 2017) ("When parties have a valid, integrated written agreement, the parol-evidence rule precludes enforcement of prior or contemporaneous agreements.") As noted above, the Amended Employment Agreement still described Karahogitis' "continuous employment with the Teleperformance Group," and Karahogitis was treated as Teleperformance employee.

Third, the First Amendment refers to an obligation to issue "payment of the commissions and bonuses" due to Karahogitis "for the last two (2) calendar quarters of the fiscal year ended December 31, 2022 and the first two (2) calendar quarters of the fiscal year ended December 31, 2023" under the 2022 SIP. The 2022 SIP provides that incentives were to be paid on a quarterly basis, with payment "done in the payroll on the second month following the close of the quarter (May, August, November, February)." ROA.3320-3337. It is therefore unclear if the incentives were calculated from the work performed in the last two quarters in 2022 and

60

the first two quarters in 2023, *or* whether the incentives simply became due to be paid out in those quarters. This is the very definition of ambiguity.

The circumstances concerning the creation of the First Amendment also warrant consideration: (1) Teleperformance continued to present new, amended agreements and required Karahogitis to sign before paying her earned compensation; (2) Teleperformance took the position that it had no obligation to pay any commissions after January 1, 2023, so Karahogitis was not entitled to the commissions she earned in 2022, despite assurances that she would be; (3) Collard informed Karahogitis that relocation benefits "were not usually included in an employment agreement;" and (4) Karahogitis had numerous discussions with Collard and others about her 2022 commissions, with Collard acknowledging that Teleperformance agreed to continue paying commissions "to help compensate for the taxation issues from your Romanian contract and having to become a TP employee" and that Karahogitis was also entitled to additional commissions for the first two quarters of 2023. ROA.3481, 3491-3500.

The ambiguities in the First Amendment therefore should not have

61

precluded Karahogitis from submitting parol evidence to discern the meaning of the First Amendment. *See First Bank*, 519 S.W.3d at 109-10 ("Courts may consider the context in which an agreement is made when determining whether the contract is ambiguous."). TPUSA is listed as a party on the Amended Employment Agreement. Further, a factual dispute exists as to whether TPUSA was a party to the First Amendment by virtue of assuming the obligations outlined in the contract. A non-party to a contract can be liable for breach of another party's contract if the non-party expressly or impliedly assumed an obligation in that contract. *Fid. Funding Bus. Credit, Ltd. v. Republic Bus. Credit LLC*, No. 3:16-cv-2492-B, 2017 U.S. Dist. LEXIS 179750, *5-6 (N. D. Tex. Oct. 30, 2017) (collecting cases establishing that a non-signatory can be held liable under a contract if it expressly or implicitly assumes the contract's obligations). The contract determines whether the non-signatory expressly or impliedly assumed the duty to pay commissions. *Id.* at *6. Here, the First Amendment clearly references the 2022 SIP, which a jury is entitled to consider.

### ii. Karahogitis performed under the agreements by timely submitting documentation substantiating her earned commissions, fees, and bonuses.

While TPUSA contends that Karahogitis "failed to perform because she did not submit the invoice for these commissions by the contractually required deadline," ROA.763, this contention is false. Per the First Amendment and 2022 SIP, Karahogitis submitted her documentation substantiating her earned commissions and the fees earned by Excalibur via Commission Approval Worksheet, well before the July 31, 2023 deadline, and then generated a courtesy invoice reflecting the amounts owed. ROA.3481; ROA.3440-3441; ROA.3444-3447.

### iii. TPUSA breached the contract by withholding Karahogitis' earned commissions, fees, and bonuses.

TPUSA further argued that no agreement required it to pay Karahogitis her commissions, paid time off, relocation benefits, or severance pay. However, the Amended Employment Agreement itself outlines additional benefits. It plainly states that Karahogitis is "entitled to paid-time-off (PTO) equivalent to five (5) weeks […] per calendar year." ROA.3512.

TPUSA argues that "Special Payment" equates to severance pay under the Amended Employment Agreement, but it does not. "Special

63

Payment" is provided when TPUSA waives the non-competition and non-solicitation provisions within the Amended Employment Agreement. Severance pay, on the other hand, is described in Section 4(d) of the Amended Employment Agreement:

> Company may terminate Employee's employment without Cause during the Period of Employment upon six (6) months' prior written notice (or pay in lieu thereof). In the event of termination pursuant to this Section 4(d), Company shall pay to Employee, within five (5) Business Days after the Employment Termination Date or such later date as may be required […] a singular post-employment payment as set forth on Exhibit A.

ROA.3514. Exhibit A did not set forth the "singular post-employment payment." ROA.3527.

As to the relocation bonus package, Collard and Alan Winters agreed to provide this benefit. Yet, nearly two years later, TPUSA has still yet to pay all compensation due to Karahogitis.

### iv. Because of TPUSA's breach, Karahogitis has sustained damaged.

"[T]he universal rule for measuring breach-of-contract damages is compensation for the claimant's actual losses." *Massimo Motor Sports, LLC v. Shandong Odes Indus. Co.*, No. 3:21-cv-2180-X, 2024 U.S. Dist. LEXIS 20345, *3 (N.D. Tex. Feb. 6, 2024). The evidence showed that

64

Karahogitis was not paid what was she was owed under her agreements. Accordingly, there was a factual dispute as to Karahogitis' breach of contract claim, rendering summary judgment on that claim inappropriate.

## C. Karahogitis' fraud claim.

The district court also erred in summarily dismissing Karahogitis' claim for fraudulent inducement. "A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46, 48 (Tex. 1998).

The district court disposed of Karahogitis' fraud claim because she allegedly did not offer evidence of intent to defraud. ROA.3722. This was improper. Because "intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986). Consequently, it "is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Id.* Thus, the district court erred in granting

65

summary judgment on her fraud claim.

The circumstances surrounding the execution of the contracts also suggests fraudulent intent. Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001)

As of November 2022, the parties had agreed in writing that the agreement that had been reached "in respect of your position change in Teleperformance (effective June 1, 2022) as to the duration of SIP payments on Opportunities won when [Karahogitis was] acting as Regional SAM. ROA.3481, 3491-3500. Matthew Cuthill, Director of Digital Transformation – Finance at Teleperformance, was copied on that email and Karahogitis' response:

> Everything I worked on while under my SAM role will be paid out, this was agreed with Miranda and Dinos as well. Unfortunately, many of my CAW's are still in DocuSign as they are pending signatures.

ROA.3499.

Cuthill, on November 23, 2023, confirmed Karahogitis' understanding and subsequently asked for a copy of Collards' approval.

> So the payments would only stop once the 2 years for the normal SAM commission or 4 years for the BD commission

66

has ran its course.  So potentially until 2026 :)  We should not
except any new revenue deals starting after June 1st though?

ROA.3498.

Karahogitis forwarded these emails to Collard on December 2,
2022, to get Collards' written approval, and Collard responded
"*Approved.*"  ROA.3497-3498.

Although Karahogitis had already started in her position in June
2022, and she was working 90-hour weeks, Teleperformance stopped
paying her normal wages and withheld her 2022 past due bonuses.  The
jury can conclude that it did so to pressure her to quickly sign the
contract. Given that Karahogitis had been performing in her new role for
six months as of January 2023, there was no legitimate business reason
for insisting on the new contract and there has never been an explanation
as to why what was "Approved" by Collard did not, according to TPUSA,
make it into the Agreement.  The jury can take these facts into account
when assessing TP's intentions.

## CONCLUSION

In sum, numerous fact issues existed with respect to all of
Karahogitis' causes of action.  Therefore, the Judgment of the district

court should be reversed and this case should be remanded for trial on the merits of all of Karahogitis' claims.

Dated: December 3, 2025.

Respectfully submitted,

*/s/ Brian Vanderwoude*
J. Brian Vanderwoude
Texas Bar No. 24047558
**DORSEY & WHITNEY LLP**
200 Crescent Court, Suite 1600
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile
vanderwoude.brian@dorsey.com

**ATTORNEY FOR APPELLANT**
**ATHINA KARAHOGITIS**

# CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2025, I transmitted a true and correct copy of the foregoing to the Clerk and the Court and served a true and correct copy of the foregoing on the following attorneys of record via the Court's ECF system:

Ryan C. Krone
Akerman LLP
1300 Post Oak Blvd., Suite 2300
Houston, Texas 77056

Eric A. Gordon
Akerman LLP
777 S. Flagler Dr., Suite 1100W
West Palm Beach, Florida 33401
*Attorneys for Appellee*

*/s/ J. Brian Vanderwoude*
Attorney of record for Appellant

# CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1, this document contains 12,945 words.

2.      This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ J. Brian Vanderwoude*
Attorney of record for Appellant